# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **TAMIKA BIZZELL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12CV00075 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **SPRINT/UNITED MANAGEMENT CO.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Marsha M. Arnurius, Johnson City, Tennessee, and Charlton R. DeVault, Jr., Kingsport, Tennessee, for Plaintiff; Melissa L. Taylormoore and Ronda B. Esaw, McGuireWoods LLP, Tysons Corner, Virginia, for Defendant.*

In this employment discrimination case under Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C.A. §§ 2000e to 2000e-17 (West 2012), the plaintiff claims that her former employer engaged in racial discrimination and subjected her to a retaliatory discharge. The employer has moved for summary judgment in its favor, and for the following reasons, the motion will be granted.

I. Factual Background.

The following facts taken from the summary judgment record are either undisputed, or where disputed, are stated in the light most favorable to the plaintiff.

In February 2001, the plaintiff, Tamika Bizzell, also referred to as Coco Bizzell, an African-American, began working for defendant Sprint/United

Management Company ("Sprint") at its call center located in this judicial district. She was interviewed and hired by Christine Leonard, a manager, and by Lisa Johnson, a human resources employee. Bizzell points out that during her employment at the Sprint call center, she "regularly received company accolades, awards, vacation trips, including a trip to the Bahamas, and award certificates as a result of [her] superior job performance." (Bizzell Decl. ¶ 5, ECF No. 18-1.) She was also a top-rated "Platinum Performer" in recognition of her excellent attendance record. (*Id.* at ¶ 10.)

On the other hand, the plaintiff's personnel file clearly indicates that her tenure had continuing problems relating to rudeness. She was first reprimanded as far back as April 10, 2001, when her supervisor determined she was "loud and rude and inconsiderate to her partner and those around her." (Domer Decl. Ex. B, Bates No. 00247, ECF No. 14-4.)

Feedback of this sort was typical over the course of Bizzell's employment with Sprint. In a July 19, 2005, Letter to the File, supervisor Jimmy Ramsey reprimanded the plaintiff for "Rude Discourteous Behavior" in a call with a Sprint store representative[1] and listed thirteen "prior documentation[s]" concerning tone and rudeness beginning in 2003 until the date of the letter. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 10, ECF No. 14-14.) On January 12, 2008, supervisor Michael

---

[1] In the course of her duties, Bizzell handled calls from Sprint employees located in Sprint retail locations ("store representatives"), as well as from Sprint customers.

Robinson gave the plaintiff a First Level Corrective Action Notice "for rude and condescending behavior," citing two specific calls. (*Id.* Ex. 11, ECF No. 14-15.)

On September 26, 2008, Melissa Blaylock recommended Bizzell's termination, based upon three particular calls in which Bizzell displayed a rude tone. According to Blaylock, "[i]n reviewing the first 2 calls listed with Coco, she understood that her tone was bad. Coco stated that it was [because] she has a lot of stress and issues going on in her life." (Bizzell Decl. Ex. A, ECF No. 18-2.) Bizzell, however, asserts that the then-Call Center Director Ted Smith rejected the recommendation that she be fired, telling her that he knew it was simply her "'accent'" misinterpreted as rudeness. (Bizzell Decl. ¶ 8, ECF No. 18-1.) Nevertheless, on September 3, 2009, supervisor Janet Mullins gave the plaintiff a Second Level Corrective Action Notice, when she was found "being rude, talking when the customer was talking, and at one point argumentative." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 12, ECF No. 14-16.)

Bizzell received a Third Level Corrective Action Notice from Mullins on October 14, 2009, after she was observed "overtalking and having a rude tone." (*Id.* Ex. 13, ECF No. 14-17.) On November 5, 2010, the plaintiff received her final Corrective Action Notice, when supervisor David Smith "observed [her] being rude and unwilling to assist our store reps." (*Id.* Ex. 14, ECF No. 14-18.) Smith warned Bizzell that "[t]here should be no further calls which can be identified as

'rude and unwilling to assist.' . . . Should any further incidences of this nature occur, further corrective action could result, up to and includ[ing] termination." (*Id.*)

Bizzell does not deny that she did in fact receive these reprimands but claims that "[t]he white supervisors . . . used [her] black accent as a basis to fabricate several reprimands for allegedly being rude to customers." (Bizzell Decl. ¶ 9, ECF No. 18-1.) She further contends that "[t]eam leader Blalock and white team leader Jane Mullins periodically ridiculed [her] black accent and [her] habit of talking rapidly." (*Id.*)

In 2011, the plaintiff was assigned to supervisor Jim Worley's team. As the only black member of Worley's team, Bizzell believes she was treated differently than her white coworkers, insofar as Worley "began refusing to assist [her] in resolving customer complaints. " (*Id.* at ¶ 15.) Worley warned Bizzell that she had "'no room for mistakes'" and told her to "'have a slower pace with [her] accent and the way [she] talk[ed] may sound sarcastic.'" (*Id.* at ¶ 16.) In May of 2011, Worley informed Bizzell that she did not qualify for a raise due to Ramsey's previous Letter to the File. Bizzell subsequently called Sprint's Ethics Hotline to complain about Worley's actions but made no mention of any racial motivation.

On June 28, 2011, coworker Mary Lawson, who was stationed near Bizzell on the call center floor, reported an incident to manager Christine Leonard.

According to Leonard's interview notes, Lawson had "heard Coco [] call her store rep a MF, she put him on mute (hold) and was saying that [she was] afraid [Lawson's] customers were going to hear it." (Domer Decl. Ex. D., Bates No. 00258, ECF No. 14-6.) Leonard began questioning other call specialists stationed near Bizzell. Trish Farmer did not hear Bizzell use profanity on June 28 but indicated that the plaintiff used profanity on the floor "multiple times every day. Her favorite word is the 'MF.'" (*Id*. at Bates No. 00254.) Farmer hesitated to report Bizzell's use of profanity "because [Bizzell] is intimidating and [she did not] want to be [a] tattle tale." (*Id*.) Leonard's typed notes indicated that Mary Cozart had said that Bizzell "has been using profanity on the phone, uses the MF word a lot." [2] (*Id*. at Bates No. 00263.) Heather Richardson and Christine Hensley did not hear anything on the date in question, and in fact, when asked if she had heard any profanity on the call center floor, Hensley admitted that she may have said the " 's' word" herself on that day. (*Id*. at Bates No. 00261.) No action was taken against Hensley.

Bizzell reports a different set of events. Bizzell claims that, on the same day, a white store representative called her a "'mother fucker,'" a "'black bitch,'"

---

[2] However, in her deposition, Cozart stated, "I don't remember saying that I specifically heard her using profanity." (Cozart Dep. 10:25–11:1, Dec. 10, 2013, ECF No. 18-17.) She also did not recall ever hearing Bizzell use "motherfucker" on the call center floor.

told her to "'suck [his] dick,'" and he "'hoped [her] mother died.'" (Bizzell Decl. ¶ 20, ECF No. 18-1.) Upset, she reported the incident to Worley, who told her there was nothing he could do about it. Bizzell anonymously called the Ethics Hotline to complain about Worley's "failure to redress race discrimination." (*Id.* at ¶ 21.)

On July 8, 2011, Bizzell received a call from manager Leonard, informing her that she was being investigated for having used profanity on June 28 and that she was suspended with pay. During this conversation, Bizzell informed Leonard that white coworker Amy Stringer had used the words "'bitches'" and "'fuck'" while speaking to supervisor David Smith at a July 5 team meeting. (*Id.* at ¶ 27.) Leonard investigated these allegations but concluded that they were meritless. On the same day, Leonard forwarded her Recommendation for Termination to Call Center Director Deborah Domer; therein, Leonard concluded,

> Given these latest events of unprofessional conduct, inappropriate tone with customers, disrupting the work of others, and the fact the profanity was not reported as the "one time" use of profanity, but as a pattern, it is a risk to our company to allow her to continue to take calls. I am recommending a termination of employee for violation of the Code of Conduct.

(Domer Decl. Ex. C., Bates No. 00286, ECF No. 14-5.) Domer recounted, "After meeting with Ms. Leonard, I reviewed Ms. Leonard's Recommendation for Termination and also reviewed Bizzell's performance history. I concurred in Ms. Leonard's conclusion that Bizzell's conduct violated Sprint policies, and as a

result, [] made the decision to terminate her employment . . . effective July 8, 2011." (Domer Decl. ¶ 13, ECF No. 14-2.)

Bizzell claims that "Leonard exaggerated and fabricated [her] using profanity in the investigation report." (Pl.'s Resp. 11, ECF No. 18.) The plaintiff also contends that neither Hensley nor Stringer were disciplined for their alleged use of profanity, and, as a result, she received less favorable treatment for a similar violation of the profanity policy.

Following discovery in this case, Sprint has moved for summary judgment in its favor, contending that the record shows that Bizzell is unable to prove in accord with applicable legal standards that her termination was the product of racial discrimination or in retaliation for engaging in protected activity. The motion has been fully briefed and is ripe for decision by the court.³

## II. DISCUSSION.

This court has an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v.*

---

³ I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

*Catrett*, 477 U.S. 317, 323-24 (1986)). As such, summary judgment is appropriate when there is "no genuine dispute as to any material fact," given the parties' burdens of proof at trial. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether the moving party has shown that there is no genuine dispute of any material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), *overruled on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Applying these standards, the defendant's motion for summary judgment must be granted.

### A. Racial Discrimination Claim.

Title VII, among other things, prohibits employers from discriminating against employees on the basis of race. 42 U.S.C.A. § 2000e-2(a)(1). A plaintiff bringing such a claim "may avert summary judgment . . . through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). In the alternative, a plaintiff may make use of

the proof scheme laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and "proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285. In the absence of direct evidence, a plaintiff must first show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). In the present case, the plaintiff has not established that she was satisfactorily performing her job, nor has she proffered evidence that her termination constituted a difference in treatment from similar employees outside the protected class.

The overwhelming evidence establishes that Sprint viewed her job performance as unsatisfactory. The plaintiff does offer a self-assessment of her job performance, but her personal opinion alone cannot establish a genuine issue of material fact. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (internal quotation marks and citation omitted). Bizzell was coached on rudeness repeatedly and continuously throughout her employment at Sprint, and because the issue was not resolved, she

was placed on every stage of corrective action notice from 2008 until the end of 2010. She alleges that the coaching and corrective actions were racially motivated by disdain for her "black accent," but that contention is nowhere supported by the evidence. In fact, the coaching reports and corrective action notices, referencing particular calls, span several years and several different managers but contain consistent criticisms about her tone and communication skills. It was this record, considered in conjunction with her reported violation of the profanity policy, that served as the basis for her termination.

Even assuming the plaintiff has established that her job performance satisfied the defendant's legitimate expectations, she has nonetheless failed to show that she was treated less favorably than those similarly situated employees outside of the protected class. "[A] prima facie case of discrimination is established if the plaintiff shows that [she] 'engaged in prohibited conduct similar to that of a person of another race . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.'" *Kelley v. United Parcel Serv., Inc.*, 528 F. App'x 285, 286 (4th Cir. 2013) (unpublished) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-1106 (4th Cir. 1985)). Bizzell contends that two white employees similarly violated the profanity policy and received more favorable treatment: Hensley, who admitted to Leonard that she possibly used the "'s' word" on the call center floor,

and Stringer, whom the plaintiff alleged hearing use "bitches" and "fuck" in a conversation with a supervisor. However, the plaintiff has not shown that these individuals "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished). Hensley self-reported a possible one-time violation, and the plaintiff's allegations against Stringer were investigated and dropped as unsubstantiated. However, several coworkers confirmed that the plaintiff had repeatedly used profane language. Moreover, the defendant has shown that four white employees — James Allen, Matthew Wilson, Brandi Alvis, and Tanya Denney — were also terminated in 2011 for similar violations of the profanity policy.

Bizzell contends that her alleged "one-time personal use of profanity" can be differentiated from the "egregious use of profanity" by the other employees terminated in 2011 for violation of Sprint's profanity policy. (Pl.'s Supplemental Resp. 2, ECF No. 33.) However, Bizzell's argument ignores the "reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). It's clear that

while Bizzell's use of profanity was a precipitating event leading to her discharge, her history of inappropriate conduct was a major factor in Sprint's decision.

Furthermore, there is no indication that Sprint's basis for termination was pretextual. The undisputed evidence establishes that Domer, the decisionmaker, believed that Bizzell violated Sprint's profanity policy and failed to meet Sprint's legitimate expectations. Her decision was based upon Leonard's report and recommendation, as well as a review of the plaintiff's extensive record of rudeness and communication problems. Bizzell claims that Leonard harbored racial animosity, and as a result, fabricated the report upon which Domer relied to make her termination decision.[4] However, "when an employer gives a legitimate, non-

---

[4] In a recent decision, the Supreme Court held cognizable the "cat's paw" theory of liability against an employer under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), recognizing both that "[a]n employer's authority to reward, punish, or dismiss is often allocated among multiple agents," *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011), and that "[t]he one who makes the ultimate decision does so on the basis of performance assessments by other supervisors." *Id.* at 1192-93. The Court held that, "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194 (footnote omitted). *Staub* was limited to the USERRA, and the Fourth Circuit has adopted a more stringent standard under Title VII, where the "biased subordinate" was, in effect, that actual decisionmaker. *Hill,* 354 F.3d at 288-89. For instance, a subordinate harboring unlawful intent may be deemed the actual decisionmaker "where the supervisor's reports and recommendation were merely rubber-stamped by the formal decisionmaking committee." *Id.* at 291. Nonetheless, under either standard, there is no evidence to support the allegation that Leonard's actions were motivated by racial animus. Indeed, Leonard's involvement in the decision to hire the plaintiff speaks powerfully against a later discriminatory motivation. *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that

discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (internal quotation marks and citation omitted). There is no evidence by which a reasonable factfinder could determine that Domer relied upon any basis other than the reported violation of the profanity policy, in conjunction with the plaintiff's problematic employment history. Based on these facts, summary judgment is appropriate on the plaintiff's discrimination claim.

### B. Retaliation Claim.

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [an employee] has opposed any practice" prohibited by Title VII. 42 U.S.C.A. § 2000e-3(a).[5] When there is no direct evidence of retaliation, the plaintiff must show: (1) that she engaged in a protected activity under Title VII; (2) that her employer took adverse employment action against her; and (3) that there existed a causal connection between the protected activity and the adverse action. *See Munday v. Waste Mgmt. of N. Am.,*

---

discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes.").

[5] The failure of the plaintiff's discrimination claim does not necessarily foreclose her claim of retaliatory discharge. *Ross*, 759 F.2d at 357 n.1 ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination.").

*Inc.*, 126 F.3d 239, 242 (4th Cir. 1997). "The employer may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual." *Id*. (citations omitted).

Relevant to the present protected activity inquiry is the opposition clause of Title VII's retaliation provision. In order for an activity to be protected, an employee must oppose practices that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e-2(a)(1). "'The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Moreover, the Fourth Circuit has held that the protection of the retaliation provision extends "not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-407 (4th Cir. 2005). To determine whether the plaintiff held such a reasonable belief, "[t]he inquiry is therefore (1) whether [the plaintiff] subjectively (that is, in good faith) believed that the [defendant] had engaged in a

practice violative of [Title VII], and (2) whether this belief was objectively reasonable in light of the facts." *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003) (internal quotation marks, citation, and footnote omitted).

Sprint referenced Bizzell's Ethics Hotline calls in its briefing of the summary judgment motion, but the plaintiff clarifies that "the complaint from which the retaliation claim flows is not the Hotline call but is Ms. Bizzell's complaint to Worley about the white store representative's racist rant" (Pl.'s Resp. 18, ECF No. 18), presumably to demonstrate opposition to a hostile work environment.[6] A determination of whether a work environment is hostile or abusive requires "looking at all the circumstances," *Harris*, 510 U.S. at 23, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* On the other

---

[6] Of the Ethics Hotline calls, only the second contained a complaint of race discrimination. The first call was absent of any complaint of race discrimination, and, according to the plaintiff, it was a mere complaint that "Mr. Worley was ignoring [her] requests for help and refused to give [her] a merit raise." (Bizzell Decl. ¶ 18, ECF No. 18-1.) As such, the first complaint is not protected against retaliation under Title VII. *See Sajadian v. Am. Red Cross*, No. 99-1263, 1999 WL 1111455, at *1 (4th Cir. Dec. 7, 1999) (unpublished) ("Although she raised general concerns about her workload, hours, and denial of leave, there is no evidence that either [the defendant or the person to whom she was complaining] was aware that her complaints were based on an allegation of discrimination."). The second was based on the complaint to Worley and his failure to redress the store representative's racist rant. While it is true that her complaint to Worley was largely ignored, the remote location of the store representative and the isolated nature of the incident lessen the risk that, without intervention from management, her workplace would become permeated with racial hostility or abuse. As such, the second call is also outside the scope of Title VII's retaliation provision.

hand, "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). The store representative's comments, while reprehensible, were an isolated incident perpetrated by a Sprint employee who worked in a remote store, leaving little indication that the plaintiff would ever interact with the representative again. Because I "cannot simply *assume*, without more, that the opposed conduct will continue or will be repeated unabated," *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 341(4th Cir. 2006), I find that the plaintiff's complaint to Worley was not based on an objectively reasonable belief that she was opposing a racially hostile work environment.

Even if the plaintiff could show that she had engaged in a protected activity, she has not put forth evidence to show a causal connection between it and her termination. In an attempt to demonstrate a causal connection between her complaint to Worley and her termination, the plaintiff offers evidence of the temporal proximity between the complaint and her termination. While evidence of temporal proximity "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). However, the Supreme Court has recently held that a Title VII plaintiff

claiming retaliation must establish that "her protected activity was a but-for cause of the alleged adverse action by the employer. . . . which is more demanding than the motivating-factor standard ." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Bizzell cannot meet this demanding standard.

Additionally, Bizzell's retaliation claim fails because the record does not demonstrate that Sprint's legitimate, nonretaliatory reason for terminating her employment was pretextual. Bizzell attempts to discredit Leonard's investigation, and Domer's reliance thereupon, with conclusory allegations of racial animus, but, as discussed above, the evidence in the record overwhelmingly indicates that both supervisors honestly believed Bizzell had violated Sprint's profanity policy. *See Walker v. Mod-U-Kraf Homes, LLC*, No. 7:12CV00470, 2013 WL 6729525, at *12 (W.D. Va. Dec. 19, 2013) ("While Walker may disagree with the outcome of the investigation, she has failed to raise a triable issue of fact as to whether Adkins and McDaniel honestly believed that Walker deserved to be discharged for her involvement in the altercation."). Moreover, the honesty of their belief is not challenged by Bizzell's claim that her use of profanity was a recitation of language directed at her by a store representative. While the evidence may show that the disciplinary action taken was in fact unwarranted given the alternative set of events recounted by the plaintiff, that does not create a triable issue sufficient to escape summary judgment. *See Gibson v. Fluor Daniel Servs. Corp.*, 281 F. App'x 177,

179 (4th Cir. 2008) (unpublished) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.") (internal quotation marks and citation omitted)). In statements to Leonard, a number of the Bizzell's coworkers indicated that she routinely used profanity, and these statements, coupled with her coaching record and corrective action notices, served as the basis for her termination. For these reasons, summary judgment is also appropriate on the plaintiff's retaliation claim.

### III. CONCLUSION.

For the reasons stated, it is **ORDERED** that Defendant Sprint/United Management's Motion for Summary Judgment (ECF No. 13) is GRANTED. A separate final judgment will be entered in favor of the defendant.

ENTER: March 25, 2014

/s/ James P. Jones
United States District Judge